IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**DR. PRESTON BOLES**                                             **PLAINTIFF**

**V.**                                                          **NO. 4:21-CV-88-DMB-JMV**

**GREENWOOD LEFLORE**
**HOSPITAL**                                           **DEFENDANT**

**OPINION AND ORDER**

Dr. Preston Boles sued his employer, Greenwood Leflore Hospital, alleging race discrimination claims regarding his pay and a breach of contract claim. The Hospital has moved for summary judgment on all Boles' claims and Boles has moved for summary judgment on some of the Hospital's affirmative defenses. In response to the Hospital's summary judgment motion, Boles abandoned his breach of contract claim so it will be dismissed. But because Boles, who is black, presented substantial evidence that the Hospital's proffered reason for the pay discrepancy between him and a white comparator is pretextual, the Hospital's summary judgment motion will be denied. And because the Hospital failed to provide evidentiary support for the challenged affirmative defenses in response to Boles' summary judgment motion, Boles' summary judgment motion will be granted.

**I**
**Relevant Procedural History**

On August 2, 2021, Dr. Preston Boles filed a complaint in the United States District Court for the Northern District of Mississippi against his employer, Greenwood Leflore Hospital. Doc. #1. The complaint, which alleges that Boles, who is black, was paid less than a white doctor, asserts race discrimination claims under Title VII, 42 U.S.C. § 1981, and the Equal Protection

Clause of the Fourteenth Amendment,[1] as well as a state law claim for breach of Boles' employment contract. *Id.* Boles seeks back pay; lost employment benefits; consequential, compensatory, and punitive damages; pre- and post-judgment interest; attorney fees and costs; "[a]n injunction curing [the Hospital's] unlawful conduct and prohibiting it from engaging in any similar misconduct in the future;" "[n]otice [to be] given to all employees regarding the violations and … their legal rights;" final judgment against the Hospital; and "any other relief available under any applicable principal in law or equity." *Id.* at PageID 11. The Hospital's answer to the complaint includes a number of affirmative defenses. Doc. #7 at 12–13.

After the parties engaged in discovery, the Hospital filed a motion for summary judgment on July 8, 2022. Doc. #48. Three days later, Boles filed a motion for partial summary judgment on certain affirmative defenses raised in the Hospital's answer. Doc. #51.[2] Both motions are fully briefed. Docs. #49, #57, #62 (the Hospital's motion); Docs. #53,[3] #64, #65 (Boles' motion).

## II
## Standard

> Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit. [Courts] view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor.

*Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021) (cleaned up). As here, where "parties file cross-motions for summary judgment, [the court] review[s] each party's motion independently,

---

[1] The Equal Protection claim is brought under 42 U.S.C. § 1983. Doc. #1 at PageID 9–10.

[2] Boles failed to attach his exhibits to his initial motion for summary judgment, Doc. #50, which was terminated by the Clerk of Court after Boles refiled the motion with the exhibits later the same day, Doc. #51.

[3] Because Boles originally titled his memorandum as a motion, Doc. #52, the Clerk of Court directed him to refile it with the correct title.

2

viewing the evidence and inferences in the light most favorable to the nonmoving party." *McGlothin v. State Farm Mut. Ins. Co.*, 925 F.3d 741, 745 (5th Cir. 2019).

### III
### Relevant Facts

#### A. Initial Employment and Contract Renewals

Dr. Preston Boles, a podiatrist, opened his own practice in Greenwood, Mississippi, in 1992. Doc. #48-1 at PageID 356. He sold his practice to Greenwood Leflore Hospital in 2006 and became a Hospital employee. *Id.* The Hospital paid Boles $15,000.00 for his office equipment and furnishings. *Id.* at PageID 358–60. Pursuant to a "Physician Employment Agreement," Boles accepted a base salary of $65,000 as well as an "incentive" of "90 percent of productivity," meaning that if his "billing was more than [his] salary, then [he] would receive a percentage of anything over and beyond that amount." *Id.*; Doc. #56-1 at PageID 516–26. A July 9, 2007, "First Amendment to Recruitment and Employment Agreement" increased Boles' salary to $126,000 to match the "median level." Doc. #48-1 at PageID 373, 395–98, 410.

Boles and the Hospital renewed the agreement multiple times at the same base salary. Doc. #48-1 at PageID 365–66; Doc. #56-1 at PageID 536–44. However, Boles' productivity did not hit the required levels such that in 2009, the Hospital was "subsidizing [Boles] at $133,000" and "there was an issue with [him] getting behind on [his] charts," which resulted in problems with the Hospital being paid for his charges. Doc. #48-1 at PageID 361–62. At times, Boles was in excess of 300 charts behind. *Id.* at PageID 362. Boles' "patient count ranged from 240 to 300 a month" in 2009; "the MGMA standard was 80 patients a week, which would be about 360 a month."[4] *Id.*

---

[4] MGMA stands for "Medical Group Management Association, which "gather[s] information from various practices and specialists in geographic areas of the United States and make[s] an assessment of how much the physician produces, how many patients the physician sees, [and] the average salary." Doc. #48-1 at PageID 363.

at PageID 400.[5]

## B. Conversion to WRVU Structure

Because Boles' productivity resulted in a "negative number," the Hospital decreased his salary to $113,400 in December 2012, and Boles "agreed to modify and amend [his] payment structure so that [his] future compensation would be based on a [work relative value unit or] WRVU structure." *Id.* at PageID 367–68; Doc. #56-1 at PageID 545–46. According to Boles, a WRVU "is a number that is given to the amount of work that a provider puts into a certain diagnosis code or charge." Doc. #48-1 at PageID 368–69.

Under the WRVU structure and the amended contract, Boles "would be entitled to the full base salary only if the actual WRVUs attributable to [his] professional services exceeded 2,500 WRVUs in the employment year."[6] *Id.* at PageID 369; *see* Doc. #56-1 at PageID 546–47. Boles was also eligible for incentive compensation at a "conversion factor" of "$44.05 for WRVUs exceeding 2,600 WRVUs in an Employment Year." *Id.*

Because Boles "RVUs were set at a low level, [Boles] usually exceeded the RVUs" and would get a bonus "almost double [his] base salary." Doc. #48-1 at PageID 393.

## C. Dr. Assini's Hire

In 2012, because "there were so many patients who were needing podiatry services," the Hospital began recruiting Dr. Joseph Assini, a white man. Doc. #48-1 at PageID 381, 387. Assini was certified by both the American Board of Podiatric Medicine and the American Board of Foot and Ankle Surgery. Doc. #48-4. According to Boles, Assini told him that "he could not move to Mississippi unless he received a salary of $250,000 because of his expenses." Doc. #48-1 at

---

[5] This Hospital exhibit reflects that the MGMA standard was "about 360 a month" while the Hospital's brief states that it was "approximately 320 per month," *see* Doc. #49 at 4.

[6] The employment year was a fiscal year rather than a calendar year. Doc. #48-1 at PageID 369.

4

PageID 382. Assini's initial contract contained a base salary of $240,000.00; required he perform 5,300 WRVUs; and provided for incentive compensation at a conversion rate of $43.00 for WRVUs exceeding 5,580 up to 7,500, and a rate of $46.00 for WRVUs exceeding 7,500. Doc. #56-2 at PageID 585–86.

The Hospital and Assini amended the contract effective March 19, 2014, to reflect that Assini would serve as the Hospital's Medical Coordinator and Director of Centers of Excellence and Physician Community Liaison. *Id.* at PageID 591. Assini received additional compensation of $2,000.00 per month for these duties. *Id.* at PageID 592.

In setting Assini's compensation, the Hospital "inadvertently relied on outdated MGMA data in determining the WRVU requirements, which caused [Assini's] WRVU requirements to be unreasonable for his Specialty and led to [him] owing [the] Hospital $87,649.13 for the years 2013 and 2014." Doc. #56-5 at 1. An October 1, 2015, amendment to Assini's contract increased his base salary to $250,000.00 and reduced his annual WRVUs to 4,600. Doc. #56-2 at PageID 596. It also provided for incentive compensation at a conversion factor of "$52.00 for WRVUs exceeding 4,800 WRVUs in an Employment Year." *Id.* at PageID 597. Assini's compensation for his special duties remained separate from his base salary. *Id.*

In October 2018, the Hospital and Assini extended the contract for three years without altering the base salary, WRVU requirement, or incentive compensation provisions. *Id.* at PageID 600–01.

### D. Pay Disparity

In 2015, Boles negotiated to increase his salary to $115,000. Doc. #48-1 at PageID 371; *id.* at PageID 402–03. As of July 1, 2017, Boles received a $115,000 base salary for 2,500 WRVUs

5

with incentive compensation based on a conversion factor of "$45.00 for WRVUs exceeding 2,556 WRVUs in an Employment Year." Doc. #48-1 at PageID 402–03.

Boles learned that Assini's base salary exceeded his based on a report detailing salaries for fiscal year 2018. Doc. #48-1 at PageID 429; Doc. #62-1 at PageID 701. Boles requested that his salary be increased. In response, a June 24, 2019, amendment to his contract increased his base salary to $215,000 for 4,285 WRVUs and provided incentive compensation for WRVUs over 4,285 at a conversion factor of $45.00. Doc. #48-1 at PageID 406–07. Boles also asked[7] "to increase [his] annual base to 250,000 at a conversion rate of $52, which would amount to 4,800 RVUs" but because he was "only producing at the 40th percentile of the MGMA," he was told his contract could not be increased to reflect those numbers. Doc. #48-1 at PageID 394.

### E. Calculation of Compensation

Boles explained that a "conversion factor is where the facility assigns a dollar value per WRVU" by "dividing the number of work RVUs by the salary." Doc. #48-1 at PageID 370. Carol Lea Denton, the Director of Medical Staff Services for the Hospital, confirmed that "[t]he conversion factor converts the value expressed in WRVUs to dollars." Doc. #48-2 at PageID 445.

In her declaration submitted by the Hospital, Denton states that physician compensation is determined by calculating several different components including WRVUs, practice expenses, malpractice expenses, place of service factors, and "Geographic Practice Cost Indices." *Id.* "A physician's WRVU production expectation is generally based on performance realized from a previous contract." *Id*. at PageID 446. "The production expectation schedule correlates with the physician's utilization percentage as per MGMA guidelines. If a physician exceeds the minimum

---

[7] The summary judgment record does not indicate when this request occurred so it is unclear whether Boles made one request which resulted in his base salary being increased to $215,000.00 or whether this was a separate request after that increase occurred.

production expectation, they [sic] will be entitled to a production bonus. The higher a physician's minimum WRVU production expectation, the higher a physician's conversion factor will be." *Id.* at PageID 445–46. According to Denton, because Boles "had a lower production expectation than Dr. Assini in each year they worked together," he "had a lower base salary … and a lower conversion rate regarding incentive bonuses." *Id.* at PageID 446.

During her deposition as the Hospital's 30(b)(6) representative, Denton testified that the "CPT code" that is used to reimburse the Hospital for physicians' services does not change based on the individual physician's certification. Doc. #56-4 at 71. In determining physicians' compensation, the Hospital "targets … to make sure that they're [sic] compensation – that they're receiving the amount of compensation per their productivity." *Id.* at 77. It looks to MGMA data "a lot when [it is] recruiting new physicians in" as guidance in setting the conversion rate but does not really use it for existing physicians. *Id.* at 78–80. For existing physicians, it looks at what the physician is collecting and what the WRVUs are.[8] *Id.* at 79.

## IV
## The Hospital's Motion for Summary Judgment

The Hospital seeks summary judgment on Boles' race discrimination claims as well as his breach of contract claim. Doc. #48.

### A. Title VII and § 1981

"Because employment discrimination claims brought under § 1981 are analyzed under the evidentiary framework applicable to claims arising under Title VII, [courts] consider [a plaintiff's] § 1981 and Title VII claims together." *Johnson v. VT Halter Marine, Inc.*, 820 F. App'x 283, 285

---

[8] This deposition testimony was put in the summary judgment record by Boles. Denton explained the process by describing an exhibit to her deposition but Boles did not include the referenced exhibit as part of his summary judgment evidence. Doc. #56-4 at 79.

7

n.3 (5th Cir. 2020) (internal quotation marks omitted) (quoting *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999)).

> In order to make out a prima facie case of pay discrimination under § 1981 or Title VII, a plaintiff must show (1) that he was a member of a protected class; (2) that he was paid less than a non-member; and (3) that his circumstances are nearly identical to those of the better-paid non-member. After the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer non-discriminatory reasons for the pay disparity. This is a burden of production, not persuasion and involves no credibility assessment. If the employer meets its burden, then the burden swings back to the plaintiff to show that the employer's rationale is merely a pretext. To do so, the plaintiff must put forward substantial evidence to rebut each of the nondiscriminatory reasons the employer articulates. The plaintiff may do so by showing that a discriminatory motive is more likely than a nondiscriminatory one or that [his] employer's explanation is unworthy of credence.

*Mengistu v. Miss. Valley State Univ.*, 716 F. App'x 331, 333–34 (5th Cir. 2018) (cleaned up) (citing various authorities).

### 1. Prima facie case

The Hospital does not dispute that Boles is a member of a protected class and that he was paid less than Assini, a non-member. Rather, the Hospital submits Boles cannot establish a prima facie case of race discrimination because Assini is not similarly situated to Boles. Doc. #49 at 10. It argues that (1) Boles "negotiated a much lower initial salary when he first joined [the Hospital]" while Assini insisted on a higher salary to move to Mississippi, negotiated directorships to increase his salary, and had a higher WRVU expectation than Boles; (2) Boles' production levels were lower than Assini's; and (3) Assini had "additional duties, including medical staff liaison and director of [the Hospital's] Center for Excellence." *Id.* at 10–11.

Boles responds that "[t]here can be no disputing that both doctors are podiatrists, that they have the same supervisor, and that there is no relevant difference in their employment 'violation histories' related to their pay" such that Assini is a proper comparator. Doc. #57 at 6. He argues that because the additional duties were compensated through "a separate, extra stipend of $2,000

per month," they cannot explain the difference in conversion factors applied to the two doctors. *Id.* at 7. Boles also argues the pay difference could not be the result of disciplinary history—to the extent such is an appropriate factor in a pay discrimination case—because (1) Assini had "similar issues" with productivity and owed the Hospital large sums in 2013 and 2014, when he (Boles) exceeded his productivity goals and received bonuses; (2) the problems for which the Hospital disciplined him (Boles) do not line up with changes in his pay; and (3) his (Boles') productivity issues "were not disciplinary in nature." Doc. #57 at 8–9.

The Hospital replies that Boles "does not – and cannot – establish that [he and Assini] had similar production histories or expectations" and he "fails to provide any evidence suggesting that the conversion rate difference was somehow race related." Doc. #62 at 2.

"A variety of factors are considered when determining whether a comparator is similarly situated, including job responsibility, experience, and qualifications." *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 185 (5th Cir. 2018). To the extent the Hospital relies on Assini's additional duties to argue Boles' circumstances are not nearly identical, such argument fails. Assini's contracts show that his compensation for these additional duties was separate from his base salary (and separate from his physician duties) and that his base salary was still higher than Boles' base salary. While Assini's additional duties placed more responsibility on him, there is no evidence they were considered in determining his base salary for his physician duties.

With respect to productivity, though the Hospital argues Boles was less productive than Assini such that Assini is not a proper comparator at the prima facie stage, such argument is more aptly considered regarding the Hospital's proffered reason for the pay disparity. *See Pittman v. Hattiesburg Municipal Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) ("A sufficient showing of a significant difference in the quality of job performance would constitute a legitimate

9

nondiscriminatory reason for the employer's action in rebuttal of the prima facie case."). To the extent it goes to whether Assini is a proper comparator, there is no dispute that for most of the relevant years, Boles completed fewer WRVUs than Assini. But it is not clear such makes Assini an improper comparator since Boles and Assini held similar general job duties. *Compare* Doc. #56-2 at PageID 593 (Assini's general job duties) *with* Doc. #56-1 at PageID 554 (Boles' general job duties). And while Denton's declaration states that a physician's conversion factor is impacted by his productivity,[9] such is contradicted by the fact that Assini's conversion factor increased when his WRVU requirement decreased.[10] *Compare* Doc. #56-2 at PageID 585–86 (conversion factor of either $43.00 or $46.00 for WRVUs over 5,580) *with id.* at PageID 596–97 (conversion factor of $52.00 for WRVUs over 4,800). Viewing this evidence in the light most favorable to Boles, a jury could find Assini was similarly situated such that Boles has established a prima facie case of discrimination. *See Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 89 (5th Cir. 2019) ("[W]hether two employees are similarly situated generally presents a question of fact for the jury.") (internal quotation marks omitted) (collecting cases). The burden then shifts to the Hospital to proffer a legitimate, nondiscriminatory reason for the pay difference. *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021).

### 2. Non-discriminatory reason

The Hospital asserts that it "has legitimate and non-discriminatory reasons for the pay difference between the two physicians" because "the compensation differences were based on differing production rates." Doc. #49 at 11–12. Because the Hospital bears only a burden of production rather than persuasion, it has satisfied this burden by "articulat[ing] a

---

[9] Doc. #48-2 at PageID 445–46.

[10] Additionally, Assini's base salary increased by $10,000 when his WRVU requirement was reduced by 700. *Compare* Doc. #56-2 at PageID 585–86 *with id.* at PageID 596–97.

nondiscriminatory reason with sufficient clarity to afford [Boles] a realistic opportunity to show that the reason is pretextual." *Watkins*, 997 F.3d at 282. So the burden shifts back to Boles to show pretext.

### 3. Pretext

At the pretext stage, a plaintiff must produce substantial evidence that the defendant's proffered reason is a pretext for race discrimination. *Id.* at 283. "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* A plaintiff may "establish pretext either through evidence of disparate treatment or by showing that [the defendant's] proffered explanation is false or unworthy of credence." *Id.* (internal quotation marks omitted).

> Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of the defendant's true motive. No further evidence of discriminatory animus is required because once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation.

*Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (cleaned up).

The Hospital argues Boles cannot show its reason for the pay difference is pretextual because "the record shows that his production expectation, and his actual production, were considerably lower than Dr. Assini's." Doc. #49 at 12–13. Boles argues the Hospital's explanation for the difference has changed throughout this litigation such that it is unworthy of credence. Doc. #57 at 10. With respect to productivity, he argues Denton's declaration that "the higher a physician's minimum WRVU production expectation in the contract, the higher a physician's conversion factor will be" is contradicted by Boles' and Assini's contracts. *Id.* at 14 (cleaned up). Specifically, he asserts that Assini's conversion factor increased in 2015 while his

11

WRVUs dropped and Boles' conversion factor remained unchanged when his WRVUs increased from 2500 to 4300. *Id.*

The Hospital replies that it "has maintained throughout these proceedings that basing salaries based on production expectations is a race-neutral justification for the pay difference between Dr. Boles and Dr. Assini." Doc. #62 at 3. It submits that "[i]f the two physicians had the same production expectation yet different conversion rates, Dr. Boles could have a legitimate argument regarding pay discrimination." *Id.* at 8.

The Court agrees with Boles that the comparison of his contracts with Assini's discredits the Hospital's argument that the conversion factor is determined by productivity. As discussed above, when Assini's WRVUs decreased, his conversion factor increased; however, when Boles' WRVUs increased from 2,500 to 4,285, his conversion factor remained $45.00. *Compare* Doc. #56-1 at PageID 568–69 *with id.* at PageID 572–73. Additionally, if Boles and Assini achieved the same productivity under their respective contracts, Assini would still earn significantly more. For instance, under the payment schedule in place for Boles from July 1, 2019, to June 30, 2021, had Boles completed 4,800 WRVUs, he would be entitled to his base salary of $215,000, plus incentive compensation of $45.00 per WRVU for WRVUs over 4,285. Doc. #56-1 at PageID 572–73. So his total compensation would be $238,175.00 for 4,800 WRVUs.[11] Had Assini performed the same number of WRVUs under his contract, he would have received his full base salary of $250,000.00. And for each additional WRVU Assini performed over 4,800, he would be paid $52.00 while Boles was only paid $45.00, further increasing the pay disparity for the same amount of work. Because the contracts contradict the Hospital's proffered reason, a reasonable jury could

---

[11] 4,800 WRVUs – 4,285 WRVUs =515 WRVUs. 515 WRVUs x $45.00 = $23,175.00. $215,000.00 + $23,175.00 = $238,175.00.

find the Hospital's proffered reason for the difference in pay is pretextual. Under these circumstances, summary judgment in the Hospital's favor is not warranted.

### B. Breach of Contract

The Hospital argues Boles' breach of contract claim fails because "the undisputed facts indicate that [the Hospital] paid Dr. Boles all required incentive payments under his employment." Doc. #49 at 14. In response, Boles states he is "no longer pursuing the breach of contract claim." Doc. #57 at 1 n.1. Since Boles has abandoned his breach of contract claim,[12] the Court will dismiss it with prejudice and deny as moot the Hospital's motion for summary judgment as to that claim.

## V
## Boles' Motion for Summary Judgment

Boles seeks summary judgment on the Hospital's "affirmative defenses of the statute of limitations, laches, estoppel, payment, unclean hands, accord and satisfaction, and set off." Doc. #53 at 1. He argues the Hospital admitted his Title VII claims were timely in its answer; "the doctrine of laches is inapplicable here;" the Hospital cannot prevail on a claim of either equitable or judicial estoppel; he did not engage in willful misconduct to support the defense of unclean hands; "[t]here has been no accord and satisfaction here;" the Hospital "cannot avoid liability by pleading a non-existent payment" because it has not made any payments to Boles "to close the gap between [his] compensation and Dr. Assini's;" and the Hospital has not asserted a claim against him so it "cannot claim any credit to set off the equal compensation it owes [him]." *Id.* at 2–7.

The Hospital responds that the challenged affirmative defenses "specifically applied to the breach of contract issue" and because Boles indicated "he was no longer pursuing his breach of

---

[12] "A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims." *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022).

13

contract claim" in response to its motion for summary judgment, "the Court should not issue a ruling regarding the viability of [its] affirmative defenses." Doc. #64 at 1–2.

Boles replies that "on its face, the Answer does not limit these defenses to a particular claim, and the issue is therefore presented to this Court whether the defenses could have any application to the claims at issue in this lawsuit" and because the Hospital admitted the defenses do not have any application to the Title VII claims, he is entitled to partial summary judgment on these defenses. Doc. #65 at 1.

> The familiar summary judgment burden-shifting scheme does not vary where the movant is the plaintiff challenging the nonmovant's affirmative defense; because the nonmovant bears the ultimate burden of persuasion at trial on its affirmative defense, it must (provided the movant has met its summary judgment burden) present admissible evidence legally sufficient to sustain a finding favorable to it on each element of that defense. Correspondingly, the movant should be able to obtain summary judgment simply by disproving the existence of any essential element of the opposing party's claim or affirmative defense.

*Serna v. L. Off. of Joseph Onwuteaka, P.C.*, 614 F. App'x 146, 154 (5th Cir. 2015) (cleaned up) (quoting *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997) and *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).

Because the Court already determined Boles' breach of contract claim is properly dismissed, the relevant question is whether Boles is entitled to summary judgment on the Hospital's affirmative defenses with respect to his race discrimination claims. While the affirmative defenses specified by Boles seem to apply strictly to the breach of contract claim, Boles is correct that the Hospital's answer does not limit them only to that issue. And in response to Boles' motion for summary judgment, the Hospital failed to present any argument or evidence to support the application of such defenses—particularly the statute of limitations defense—to Boles' race discrimination claims. Due to the Hospital's failure to carry its burden in that regard, summary judgment is warranted on its affirmative defenses of the statute of limitations, laches,

estoppel, payment, unclean hands, accord and satisfaction, and set off. *See id.* (district court properly granted summary judgment to plaintiff where defendant was "unable to present legally sufficient evidence to sustain his defenses").

## VI
## Conclusion

Boles' abandoned breach of contract claim is **DISMISSED with prejudice**. The Hospital's motion for summary judgment [48] is **DENIED** as to Boles' race discrimination claims and **DENIED as moot** with respect to the breach of contract claim. Boles' motion for summary judgment as to the Hospital's affirmative defenses [51] is **GRANTED**.

**SO ORDERED**, this 27th day of December, 2022.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**